**Small v Gorga**

2025 NY Slip Op 31029(U)

March 25, 2025

Supreme Court, Kings County

Docket Number: Index No. 508137/2021

Judge: Consuelo Mallafre Melendez

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

At an IAS Term, Part MMESP-7 of the Supreme Court of the State of NY, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 25th day of March 2025.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---------------------------------------------------------------------------X

EARL SMALL,

     Plaintiff,

  -against-

JOSEPH GORGA, M.D., INDLEY JOHNSON, M.D., LINDA RUSSO, M.D., TAYLOR CONRAD, M.D., MIRCEA PRIVULESCU, RN, GEORGE JOSEPH, RN, NEL TRASYBULE, M.D., DAVID SMITH, M.D., JENNAH MORGAN, M.D., PAUL LAM, M.D., AANCHAL GUPTA, M.D., KINGS COUNTY HOSPITAL and NEW YORK CITY HEALTH AND HOSPITALS CORPORATION,

     Defendants.

---------------------------------------------------------------------------X

**DECISION & ORDER**

Index No. 508137/2021

Mo. Seq. 1

**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C.**

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

NYSCEF #s: 98 – 100, 101 – 131, 132, 133 – 137, 138 – 143, 144 – 145, 146 – 150

Defendants Joseph Gorga, M.D. ("Dr. Gorga"), Indley Johnson, M.D. ("Dr. Johnson"), Linda Russo, M.D. ("Dr. Russo"), Taylor Conrad, M.D. ("Dr. Conrad"), Mircea Privulescu, RN ("RN Privulescu"), George Joseph, RN ("RN Joseph"), Nel Trasybule, M.D. ("Dr. Trasybule"), David Smith, M.D. ("Dr. Smith"), Jennah Morgan, M.D. ("Dr. Morgan"), Paul Lam, M.D. ("Dr. Lam"), Aanchal Gupta, M.D. ("Dr. Gupta"), Kings County Hospital, and New York City Health and Hospitals Corporation ("NYCHHC") move (Seq. No. 1) for an Order, pursuant to CPLR 3212, granting summary judgment to all defendants and dismissing all causes of action in Plaintiff's Complaint against them.

Plaintiff opposes the motion only as to Dr. Gorga, Dr. Smith, RN Privulescu, and RN Joseph, and as to the vicarious liability claims against Kings County Hospital/NYCHHC for Dr. Gorga, Dr. Smith, RN Privulescu, and RN Joseph.

1

[* 1]

Plaintiff does not oppose the part of the motion seeking summary judgment for Dr. Johnson, Dr. Russo[1], Dr. Conrad, Dr. Trasybule, Dr. Morgan, Dr. Lam, and Dr. Gupta. Plaintiff has discontinued and withdrawn all claims against these defendants (NYSCEF Doc. No. 138-143, 145). Accordingly, the part of the motion seeking summary judgment on their behalf, and dismissal of any vicarious liability claims against NYCHHC on their behalf, is **granted** without opposition.

Plaintiff commenced this action on April 7, 2021, asserting claims of medical malpractice against the defendants herein, in connection to treatment and care rendered at Kings County Hospital. Plaintiff alleges that ICU attending physicians and nurses improperly administered vasopressors from July 30, 2019 through August 4, 2019, leading to limb ischemia and amputation of his arms and legs.

Prior to the events at issue, Plaintiff had a history of Crohn's disease and was on Humira medication for ten years. On the morning of July 30, 2019, he was transported by EMS to Kings County Hospital with worsening shortness of breath, hypotension, and lower extremity edema. Upon arrival, he exhibited tachycardia, extremely low blood pressure, and hypoxic respiratory failure. Epinephrine was ordered by the emergency department attending physician. Plaintiff was admitted to the ICU with septic shock secondary to pneumonia.

Beginning at approximately 1:34 p.m. on July 30, Plaintiff was treated by attending ICU physician Dr. Gorga, and by residents and nurses under Dr. Gorga's direction and supervision. At 4:52 p.m., Dr. Gorga ordered repeat labs. At 5:44 p.m., an order for vasopressor Levophed was placed at 4mg in 250 mL intravenous drip (5 mcg/min). At approximately 10:22 p.m., the Levophed concentration was increased to 8mg with a target mean arterial pressure (MAP) of 60-70 and instructions to increase or decrease the dosage by 2 mcg/min every five minutes to achieve the target MAP.

On August 1, Dr. Smith took over as the ICU attending physician. Levophed continued to be administered by IV, and a second vasopressor Vasopressin was added.

---

[1] Dr. Russo is named in the Notice of Motion and supporting papers, but according to the parties, she was not served a Summons and Complaint and has never filed an individual answer in this action. Plaintiff has withdrawn his claims against Dr. Russo and does not oppose the part of the motion seeking summary judgment on claims related to Dr. Russo as a NYCHHC physician.

2

[* 2]

RN Privulescu worked various night shifts between July 30 and August 4. RN Joseph worked various day shifts between August 1 and August 4.

Beginning July 31, Plaintiff's extremities were noted to be cold to touch. On August 2, a resident observed Plaintiff had a new onset purpuric rash on both his lower extremities and hands. On August 4, 2019, non-party Dr. Zulqarnain took over as attending ICU physician. Plaintiff's assessment and plan was updated to "taper off" vasopressors and maintain MAP greater than 65. Levophed was discontinued on August 4, and Vasopressin stopped on August 5. On August 8, Plaintiff was extubated, awake, and able to follow commands.

Subsequently, Plaintiff's extremities were repeatedly documented to be cold to the touch, pulseless, necrotic, and "mummified." He was evaluated for amputation when skin was demarcated. He ultimately underwent bilaterial trans radial amputation of the arms on October 31, a right below the knee amputation on November 12, and a left below the knee amputation and sub-radial upper extremity revision amputations on November 19. He was discharged to Grand Manor Nursing Home on January 7, 2020.

Plaintiff alleges that the ICU physicians and nurses from approximately July 30 through August 4 departed from the standard of care by ordering and administering excessive vasopressors to the patient after his blood pressure had stabilized. Plaintiff further alleges that this departure proximately caused his injuries, including the loss of circulation and eventual amputation of his limbs.

In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure. Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (*Rosenzweig v Hadpawat,* 229 AD3d 650, 652 [2d Dept 2024] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or

3

unsupported by the record are insufficient to raise triable issues of fact" (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023]).

In support of the motion on behalf of the ICU physicians, NYCHHC submits an expert affirmation from Mark S. Silberman, M.D. ("Dr. Silberman"), a licensed physician board certified in internal medicine, emergency medicine, and critical care medicine.

Dr. Silberman opines that the vasopressor dosage and instructions ordered for Plaintiff on July 30 (under attending physician Dr. Gorga) complied with the standard of care. Specifically, he states that Levophed was ordered by IV drip at a concentration of 4mg in 250 mL, administered at 5 mcg/min (18.8 mL/hour), with a target MAP of 60-70. The standing order included instructions to increase or decrease infusion by 2 mcg/min every five minutes "until target is reached" and "when target is reached, continue current infusion and reassess every hour." The instructions also stated to notify the physician if the goal MAP was not reached or cyanosis (blueish discoloration) was observed in the extremities. Dr. Silberman opines that "this dosage of Levophed is moderate and within the standard of care."

Dr. Silberman further opines that the Levophed concentration in the IV drip was appropriately increased to 8 mg in 250 mL at 10:22 p.m. on July 30, with the same instructions to titrate upward or downward to reach the target MAP. He opines this concentration change was a reasonable response and "met the standard of care" due to Plaintiff's low urine output, in order to "prevent fluid overload."

When Dr. Smith took over as ICU physician on August 1, Dr. Silberman opines that he appropriately continued the Levophed and added Vasopressin at necessary levels to maintain a MAP greater than 65. He opines that no edema, rashes, or cyanosis was present at that time, and his "vasopressor requirements were slowly improving" but they were still required to sustain his target MAP.

On the issue of proximate causation, Dr. Silberman attributes the necrosis in Plaintiff's extremities to disseminated intravascular coagulation ("DIC") and purpura fulminans, which he states is a "complication of severe sepsis" and could not have been prevented by the treatment and care received at Kings County Hospital. He opines that although "limb ischemia is a well-known risk associated with pressors," this was a "minor

4

[* 4]

contribution" to his preexisting medical condition, and the vasopressors that may have exacerbated it were "necessary and appropriate" to save his life and maintain adequate blood pressure and support to his vital organs during septic shock. Therefore, he opines that his claimed injuries were not caused by any departure from the standard of care, but instead occurred due to his sepsis and multi-organ failure from a legionella infection.

The movants also submit an expert affirmation from Steven W. Papish, M.D. ("Dr. Papish"), a licensed physician board certified in internal medicine and hematology.

As a hematologist, Dr. Papish further opines on the issue of proximate causation. He states that Plaintiff arrived at Kings County Hospital in the midst of sepsis and multi-organ failure from an ongoing legionella infection, complicated by his "long-term use of Humira" which suppressed his immune system. Dr. Papish opines that his limb necrosis was caused by a combination of this existing condition, the "necessary life-saving pressor support" he received in the emergency department and ICU, and a development of DIC and purpura fulminans as a complication of sepsis. He opines that the vasopressors were necessitated by his hypotension and "played a small role" in leaving his "extremities vulnerable to ischemia and gangrene," but the primary source of necrosis and eventual amputation was DIC and purpura fulminans.

Finally, the movants submit an expert affirmation from Dial Hewlett Jr., M.D. ("Dr. Hewlett"), a licensed physician board certified in internal medicine and infectious disease.

Dr. Hewlett concurs with the opinion of the movant's other experts that the cause of Plaintiff's claimed injuries was DIC and purpura fulminans in the context of septic shock, secondary to legionella infection. He further opines that at the time of arrival, based on his labs and vital signs, he had a 10% chance of survival, and while the use of vasopressors may have "contributed" to the tissue death in his limbs, they were "necessary and unavoidable" to stabilize Plaintiff and save his life.

Based on these submissions, the movants have established prima facie entitlement to summary judgment on behalf of Dr. Gorga and Dr. Smith. They have proffered expert opinions that the use of vasopressors, as ordered and directed by the attending ICU physicians from July 30 through August 4, was appropriate and

within the standard of care to maintain the patient's target blood pressure and they were ultimately discontinued as his condition changed.

The movants have also established prima facie that no departure from the standard of care was a proximate cause of Plaintiff's claimed injuries, opining that his vascular complications were an unavoidable outcome of his preexisting sepsis and critical condition when he arrived in the ICU. The burden therefore shifts to Plaintiff to raise issues of fact.

In opposition to the motion, Plaintiff submits an expert affirmation from Vipul Kella, M.D. ("Dr. Kella"), a licensed physician board certified in emergency medicine.

Dr. Kella notes that vasopressors generally are "life-saving pharmacologic agents" administered to treat severe hypotension and septic shock by "inducing vasoconstriction" and raising arterial blood pressure. He opines that the overall protocol for administering vasopressors is to initiate when MAP is below 65, dynamically adjust to "achieve the lowest effective dose that maintains the target MAP," wean as stability is restore to minimize "prolonged exposure," and continuously monitor for signs of ischemia.

Dr. Kella opines that the attending physicians, Dr. Gorga and Dr. Smith, failed to adequately reassess and wean Plaintiff from the vasopressors during his initial days in the ICU. Dr. Gorga's initial instructions indicated that the Levophed dosage should be titrated upward or downward until the target MAP of 65 was reached, and then "continue current infusion and reassess every hour" once it was reached. The expert opines that in accordance with the standard of care "once the target MAP is reached for a sustained period of time of approximately 10-15 minutes, vasopressor administration must be adjusted" downward. He opines that a patient consistently reaching the target MAP of 65 should be "weaned off the Levophed aggressively and altogether discontinued under the direction of the MICU doctor." In this case, he opines that Plaintiff remained "hemodynamically stable" on July 31 "and every day thereafter," but rather than titrating down and discontinuing the vasopressor medication, Plaintiff continued to receive vasopressors for five days.

Dr. Kella opines that Dr. Gorga departed from the standard of care by failing to wean the patient off Levophed and in fact entering an order for additional Vasopressin on July 31. He notes that the cardiovascular

6

[* 6]

assessment on July 31 read "add Vasopressin if pressor requirement increases." Dr. Kella opines that the vasopressor requirement did *not* increase, as all his readings showed the MAP target of 65 and above was reached. Dr. Kella counters the opinion of movant's expert Dr. Silberman and opines that there was "no justification to add and administer another vasopressor medication" when the target MAP was consistently reached, yet Dr. Gorga entered an order for 100 mL Vasopressin with no tapering instructions.

Additionally, Dr. Kella opines that Dr. Gorga departed from the standard of care by failing to conduct doppler tests to measure blood flow on July 31, after the nurse noted at approximately 9:00 p.m. that Plaintiff's extremities were cold to the touch. He notes that the standard of care required this fast and noninvasive test "in the setting of all four extremities cold to touch and two vasopressor medications being administered," as they are known to constrict blood flow.

When Dr. Smith took over as attending physician, the expert opines that he departed from the standard of care by continuing the Vasopressin administration with no tapering instructions. He notes that Dr. Smith evaluated the patient at 1:33 p.m., but nothing was documented in the chart about his target MAP "having been consistently reached" or the fact his extremities were cold to touch. Dr. Kella opines that vasopressors were no longer required at that time and should have been "aggressively weaned off that day." He notes that the Levophed was being gradually tapered down, but Vasopressin continued at the maximum dose. He notes that "the target MAP range of 60-70" was shown "by over thirty-seven arterial line readings between 8:45 a.m. and 11:30 p.m.," and it never went below 65.

Dr. Kella opines that Dr. Smith also departed from the standard of care in his "delayed recognition and response" and the patient's signs of ischemia, specifically his cold extremities and new onset red rashes on his legs. He opines that in light of these signs and symptoms, Dr. Smith should have discontinued Vasopressin and ordered Doppler assessments and a vascular consult. He notes that a vascular consult did not evaluate the patient until August 8, 2019, and this delayed intervention was a departure from the standard of care.

On August 3, Dr. Kella notes that Dr. Smith documented "taper Vasopressin" at the 2:56 p.m. assessment, but there is no further "explanation as to why it should be tapered or instruction noted." There was

7

[* 7]

no order placed to taper the Vasopressin that day. He notes that Levophed was administered for the last time at 10:00 a.m. "without necessity since the target MAP was reached for days," but Vasopressin continued until the following day. He notes that an order to "taper Vasopressin and stop today" was finally entered by the August 4 ICU attending physician Dr. Zulqarnain, a non-party in the action.

On the issue of proximate causation, Dr. Kella counters the opinion of the movant's expert that Plaintiff's limb ischemia was a complication of disseminated intravascular coagulation and purpura fulminans. He opines that Plaintiff's record and blood panels were *not* consistent with a diagnosis of DIC, nor were his skin manifestations – which "gradual and first noted in the distal extremities" – consistent with the rapid hemorrhagic necrosis of DIC/purpura fulminans. He also notes that "no specific interventions aimed at treating purpura fulminans were initiated" and associated infections were never detected. Thus, he opines that the "overwhelming clinical evidence" supports that Plaintiff's limb ischemia was proximately caused by the excessive vasopressor administration constricting his blood flow. Dr. Kella also disagrees with the movant's expert that Plaintiff had a "10% or less chance of survival" or that the fact he was on immune-suppressant Humira was a cause or contributing factor in his limb ischemia and tissue death.

Plaintiff also submits an expert affirmation from Richard Hirschman, M.D. ("Dr. Hirschman"), a licensed physician board certified in hematology and internal medicine.

Dr. Hirschman offers a counter-opinion to the movant's hematology expert Dr. Papish as to proximate causation. He opines that Plaintiff's limb ischemia and eventual amputations were not the result of sepsis, DIC, and purpura fulminans. He notes that in multiple occasions within the medical chart itself, the limb ischemia is attributed to prolonged vasopressors. Aside from a single hematology consult who "stated that the drop in platelets was likely due to 'low grade DIC' in the setting of septic shock," he was never diagnosed or treated for DIC or purpura fulminans, and the expert opines in detail that his labs all "suggested low likelihood" that this was the cause.

Based on the submissions, Plaintiff has raised issues of fact sufficient to defeat the motion for summary judgment with respect to Dr. Gorga and Dr. Smith. On each physician's relevant dates of treatment, the experts

8

set forth a conflicting opinion on the appropriateness of the prolonged vasopressor orders and the fact that Plaintiff's dosage was not reassessed and tapered off. There is a conflict between the experts on the standard of care for a patient consistently maintaining the "target" blood pressure. Plaintiff's expert also raises an issue of fact that the addition of a second vasopressor (Vasopressin) was not indicated, and that it was initiated by Dr. Gorga and continued by Dr. Smith with no tapering instructions. Plaintiff raises additional issues of fact on their departures from the standard of care with respect to monitoring the patient's signs of symptoms of ischemia, opining that Dr. Gorga failed to order a Doppler test in response to his cold extremities, and Dr. Smith failed to timely order a Doppler test or vascular consult in response to his skin color changes.

Further, Plaintiff has raised issues of fact on the subject of proximate causation. Plaintiff offers a counter-opinion that Plaintiff's loss of his limbs was not the result of sepsis complications but directly and solely linked to his constricted blood flow from the vasopressors. These issues of fact and credibility between the parties' experts must be resolved by a jury, and the parts of the motion seeking summary judgment in favor of Dr. Gorga and Dr. Smith are **denied.**

Turning to the registered nurse defendants, a nurse employed by a hospital who "merely carries out the orders" of the attending physician is generally not liable for that physician's alleged medical malpractice, unless the nurse commits independent acts of negligence (*Gattling v Sisters of Charity Medical Center,* 150 AD3d 701, 704 [2d Dept 2017]; *see also Martinez v La Porta,* 50 AD3d 976, 977 [2d Dept 2008]; *Soto v Andaz,* 8 AD3d 470, 471 [2d Dept 2004]).

In support of the summary judgment motion with respect to RN Privulescu and RN Joseph, the movants' critical care expert Dr. Silberman opines, based on the ICU nursing flow sheets, that the nurses appropriately administered and documented the titration orders based on Plaintiff's target blood pressure. He opines that they titrated the Levophed dosage downward at appropriate intervals as directed.

The expert opines specifically that RN Privulescu complied with the nursing standard of care in monitoring his status and notifying ICU physicians of "any significant changes" in his condition, including by recording his changes in temperature and checking for pulses in all extremities. He notes that she reported

9

[* 9]

Plaintiff's extremities were "warm to touch" and pulses present at 10:00 p.m. on July 30, and she later reported his extremities were "cold to touch" but pulses were present at 9:00 p.m. on July 31.

Dr. Silberman opines that RN Joseph also complied with the standard of care in monitoring Plaintiff's condition and notifying physicians of changes in skin color. He cites specific notations in the record where RN Joseph recorded Plaintiff's skin redness, coldness in extremities, and pulses present, and RN Joseph also documented that "MICU team was aware" of these changes.

To the extent that these nurses carried out the orders of the attending physicians, the movants have established that they committed no independent negligence or departed from the standard of nursing care. The burden therefore shifts to Plaintiff to raise triable issues of fact as to RN Privulescu and RN Joseph.

In opposition, Plaintiff's expert Dr. Kella opines that on the evening of July 30, evening nurse RN Privulescu improperly administered vasopressors in excess of Dr. Gorga's order and did not titrate downward when the patient's target MAP was reached. He notes that the target MAP in the order was 60-70, but both attendings testified that the target was 65, which Dr. Kella opines is the appropriate target for a patient in septic shock. Dr. Kella opines that on 7:00 p.m. on July 30, the nursing flow sheets indicate that Plaintiff received 39.9 mcg/min of Levophed, exceeding the maximum dosage of "1 – 30 mcg/min" in the order. This dosage continued throughout the night shift, slightly lowered to 37 mcg/min at 1:00 a.m., and lowered further at 10:00 a.m. Dr. Kella opines that RN Privulescu departed from the standard of care by "administering Levophed beyond the max dosage and by failing to titrate it down *as instructed* after it was apparent that the target MAP was reached for a sustained period of time after 8:00 p.m."

Dr. Kella's only mention of RN Joseph is that he did not adequately "document the patient's chart with any note" during his shift on August 4, but he does not elaborate on the standard of care for documentation.

Plaintiff has raised issues of fact only as to RN Privulescu, opining that she departed from the standard of care by exceeding the maximum dosage (30 mcg/min) of Levophed and failing to timely adjust the dosage downward per the ICU attending's order during her July 30-31 overnight shift. This opinion is based on the handwritten notes in the nursing flowsheet, which read "39.9" from 7:00 p.m. to 12:00 a.m. and "37" from 1:00

10

a.m. to 7:00 a.m. (Exhibit B-1, at 104). The movants submitted a reply affirmation and supplemental expert affirmation addressing the handwritten nursing flowsheets. In the supplemental affirmation, Dr. Silberman contends that this record was misinterpreted by Plaintiff's expert, and that the "39.9" notation was measured in *mL/hour*, not mcg/min. However, the unit of measurement is not evinced by the notes themselves. The Court finds this raises at least an issue of fact as to acts of independent negligence on RN Privulescu's part, and therefore the part of the motion seeking summary judgment on behalf of RN Privulescu is **denied.**

Plaintiff has not raised any issue of fact as to RN Joseph's liability. The expert's brief mention of this nurse is conclusory and fails to articulate a departure from the standard of care. All alleged departures from the standard of care as to Levophed and Vasopressor administration during his shifts were as directed by the attending physician, Dr. Smith, and Plaintiff has not raised any issues of fact that RN Joseph exercised independent medical judgment or committed acts of negligence in his capacity as a nurse. Accordingly, the part of the motion seeking summary judgment in favor of RN Joseph is **granted.** All claims against RN Joseph, as well as vicarious liability of NYCHHC on behalf of RN Joseph, are dismissed.

It is noted that at an oral argument before the Court on March 12, 2025, Plaintiff requested to file a sur-reply to the movant's reply papers. The Court denied this request. "The function of reply papers is to address arguments made in opposition to the position taken by the movant, not to introduce new arguments or new grounds for the requested relief" (*Castro v Durban,* 161 AD3d 939, 941 [2d Dept 2018]). Notwithstanding the issues of fact regarding the nursing flowsheets, as discussed above, new arguments and assertions in the movant's supplemental expert affirmation were improperly raised for the first time in reply and have not been considered herein.

Accordingly, it is hereby:

**ORDERED** that the part of the motion (Seq. No. 1) seeking summary judgment in favor of Dr. Johnson, Dr. Russo, Dr. Conrad, Dr. Trasybule, Dr. Morgan, Dr. Lam, Dr. Gupta is **GRANTED** without opposition; and it is further

11

**ORDERED** that the part of the motion (Seq. No. 1) seeking summary judgment in favor of Dr. Gorga, RN Privulescu, and Dr. Smith is **DENIED;** and it is further

**ORDERED** that the part of the motion (Seq. No. 1) seeking summary judgment in favor of RN Joseph is **GRANTED**; and it is further

**ORDERED** that the part of the motion (Seq. No. 1) seeking summary judgment in favor of Kings County Hospital/NYCHHC is **GRANTED TO THE EXTENT** of dismissing any vicarious liability claims on behalf of Dr. Johnson, Dr. Russo, Dr. Conrad, Dr. Trasybule, Dr. Morgan, Dr. Lam, Dr. Gupta, or RN Joseph, and **DENIED** as to vicarious liability for Dr. Gorga, Dr. Smith, and RN Privulescu; and it is further

**ORDERED** that the caption is amended to read:

SUPREME COURT OF THE STATE OF NEW YORK COUNTY
OF KINGS
--------------------------------------------------------------------------X
EARL SMALL,

       Plaintiff,

  -against-

JOSEPH GORGA, M.D., MIRCEA PRIVULESCU, RN, DAVID
SMITH, M.D., KINGS COUNTY HOSPITAL and NEW YORK
CITY HEALTH AND HOSPITALS CORPORATION,

       Defendants.
--------------------------------------------------------------------------X

and it is further

**ORDERED** that the parties shall appear for a Settlement Conference on April 2, 2025 at 10:30am; and

The Clerk shall enter judgment in favor of INDLEY JOHNSON, M.D., LINDA RUSSO, M.D., TAYLOR CONRAD, M.D., GEORGE JOSEPH, R.N., NEL TRASYBULE, M.D., JENNAH MORGAN, M.D., PAUL LAM, M.D., and AANCHAL GUPTA, M.D.

This constitutes the decision and order of this Court.

**ENTER.**

_____

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

12

[* 12]